### C. F. HARMS & CO. v. BROOKLYN ASH REMOVAL CO.

(District Court, S. D. New York. December 29, 1922.)

1. **Shipping ⬥⟶54—Charterer liable to owner for "gouging" of deck, caused by negligent unloading.**

   Where charterer hired scows for five years to transport city refuse, discharging of such refuse being universally done by an orange peel bucket, a machine which, if properly handled, will score the deck, but which will not gouge it, charterer was liable to owner for damages to the deck caused by gouging, but not liable for damages caused by scoring; gouging meaning tearing out of the fibers of the planks, as distinguishable from wearing out by pressing the fibers down.

2. **Accord and satisfaction ⬥⟶11 (2)—Accepting check for amount due no consideration for promise to release defendant from another liability.**

   Where charterer had a definite agreement with owner to pay a stated part of the cost of redecking a scow, and charterer sent a check for that amount to owner, with a statement that this would be a release from all damages done, owner by keeping the check could not vary the contract, as the check represented only the amount due.

Horace L. Cheyney, of New York City, for libelants.
Mark Ash, of New York City, for respondent.

LEARNED HAND, District Judge. This case arises on a contract of bailment or charter party between the parties hereto for the use of five scows of which only three are here in question. It was executed on the 30th day of December, 1913, and was to run for three years, and at the option of the respondent, who was the charterer, for two years more. This option was exercised, and therefore the scows were on bailment for a period of five years. On December 30, 1913, they were already, and had been for several years, in the possession of the respondent, and had been used for the same purposes in general which this charter party contemplated, and for which they were used in fact after it was made. This purpose was to receive the refuse from the city of Brooklyn, carry it to Flushing, and there have it discharged upon refuse cars, which carried it to the place of its disposal. This

libel arises only from damages done to the scows at the place of their discharge.

The work of discharging scows of refuse is universally done, at least in the earlier stages by means of what is known as an orange peel bucket, a machine which is common enough, and which we have probably most of us seen. This is a true bucket in the upper half or hemisphere, but the lower hemisphere is composed of three or four shells, or segments, which can be so manipulated as to hang freely down until they are fairly inserted in the load which the bucket is to carry, when they can be closed together, so as to make a substantial sphere or a spheroid. Obviously, in order to clutch the load, the shells or segments with their four points must be inserted into the stuff which is to be taken up, and then as the points approach each other the material is scooped or scraped into what becomes the bottom of the bucket; that is, the closed shells. These shells are made of three-eighths of an inch iron, and unless they are guarded against it, their points would be capable of inflicting a severe wound upon the deck of a scow beneath it. In order to prevent this, they are shod at the points with a kind of ball, or foil, or guard, which is globular in form and has a diameter of about four inches, and ordinarily, and if properly used, this will not actually gouge the deck of the scow.

The evidence shows that this orange peel bucket was used on these scows before they went under this charter, and it was used for the whole period of five years during which the charter ran, and a little more, because there was some delay in the redelivery, on which I need not trouble myself at present. Now, the witnesses for the respondent, who were experts, Moss and Thompson, both agreed that any gouging of the deck by these buckets, or the orange peels, was an evidence of a mishandling of the machine itself. They said that it was inevitable that the deck should be marked or "squashed," by which they meant that there would be a certain scoring of the surface of the deck. Both, however, as I have already said, agreed that, where the deck is gouged, it is evidence of misuse of the machinery, and, indeed, Thompson said that he would be prepared at any time to make good such damage.

I interpret the fourth article of the charter party, which is the one here in question, in the light of this admission, which I think corresponds with the usage of the parties. Now, what was that use? The libelants knew, of course, during the whole period of five years, and for that matter during the period before this charter went into effect, of the method by which the work was being carried on. They knew that when the cargo of refuse got to four or six inches a clam shell digger was not used down to a layer of two inches, and that thereafter the two inches was shoveled into the buckets. I give that illustration because Brower, who was called by the libelants, said that in his experience that was the way in which it was done, and it is no doubt a safer way for the boats than the way which was adopted here. If it were not for the long practice and practical construction of this contract by the parties, I am not prepared to say that I should not hold, where the charterer agreed that he should make good against any neg-

ligence in the conduct of the work and the owner was liable only for reasonable wear, that the charterer did not require something of the nature of what Brower described. But by far the best interpretation of this charter party is the practical construction which these parties put upon this instrument over a period of more than five years. It is undisputed that the orange peel bucket had been used during that period, and that it had not been supplanted at the end of a cargo by the clam shell bucket or by manual shoveling. Therefore any damage which arose from the careful handling of the orange peel bucket was part of the wear which the owner of the boat accepted.

I therefore hold that what might be called the scoring or marking of the deck, was necessarily included in the hire, and if the libelant did not make the hire large enough for that, it was his error. But I hold that, in so far as these shells on the orange peel bucket gouged the deck, that was proof of negligence in the use of the bucket. In that I am supported by the two witnesses of the respondent, and there can be no question whatever, in my judgment at least, that that is a reliable finding. Therefore the question comes as to what one should mean by "gouging."

[1] I think the witnesses understood perfectly well what they were talking about. They meant spots where the fibers of the planks are torn out, as distinct from where they are pressed down. You can continually press down the fibers, and finally no doubt wear out the deck, and where that happens by continual wearing down, or by fraying, even though the planks be worn out, it is one of the risks to which the scows were subject. But there is plenty of evidence in this case that the decks were actually ripped up, because the photographs show that the fibers were torn out of position, either torn away altogether or sticking up. It is quite impossible from the photograph to tell how extensively this occurred, and it is quite impossible from the evidence to get any quantitative estimate of how much of the damage was of that sort. I am very much afraid that it will be practically impossible for the commissioner to distinguish, and, if so, perhaps the parties may see fit, as they did before, to make some accommodation on the lines which I have laid out. I am not going to decide here, because I cannot, how much of the damage was of the kind I mentioned; but I do decide that the libelants are entitled to any damages which are caused by gouging, in the sense that I have defined it, and I direct a reference for that purpose.

[2] There remains only the question of the settlement as to the scow Crow, about which I need say nothing. It is a simple question of law and turns on this: There being an agreement between the parties that the respondent should pay two-thirds of the cost of redecking the Crow, the respondent sent a check for that amount, and added to the letter a statement that this should be a release for all damages done while in their service. This the libelants repudiated, and said that it should be damages only up to the time of the survey, which resulted in the new decking of the Crow. In the first place, if there was a final settlement between the parties at any time which dated from the survey, then the respondent could not vary that contract. In

keeping the check the libelants took no more than their due, and the respondent gave no more than it ought. If we treat, however, the contract as still uncertain in respect of this, the question arises whether, in keeping the check, although repudiating the condition of the check, the libelants became bound by the terms under which the check was sent. It seems to me that in principle this ought not to be so; but I do not carry the law at the moment with enough certainty to pass on that, and I shall reserve that point.